SPEAR, Respondent, vs. SWEENEY, Appellant.

*October 24 — November 13, 1894.*

*Assault and battery: Damages: Instructions to jury: Evidence: Cross-examination to show that plaintiff was shamming insanity: Restriction: Malice.*

1. In an action for assault and battery, plaintiff's evidence tended to show that his injuries were very serious, and had rendered him insane, and that he would never recover from the effects thereof, and was insane or partially insane at the time of the trial; but defendant claimed that plaintiff's apparent mental weakness was a sham. After charging the jury that plaintiff was entitled to some damages, and that the only question was as to the amount, the court said that the injuries were either very severe and serious, resulting perhaps in making plaintiff a physical and mental wreck, or were very slight and the plaintiff had all the time been shamming and was a huge fraud, and that it was for the jury to determine which of these things was true. *Held,* not improper.

2. It was not error for the court to say, in charging the jury, that it made no difference what particular disease it was with which plaintiff was afflicted after the assault, and " it makes no difference whether it was meningitis cerebral or spinal, or any other disease which has a Latin or Greek name. The question is, What was his condition at that time as a result of the assault? "

3. The extent to which cross-examination of the plaintiff should be allowed for the purpose of showing that his want of memory and apparent mental weakness was a mere pretense, especially where such cross-examination related to facts collateral to the issue, was a matter resting very much in the sound discretion of the trial court; and the limitation of the cross-examination in this case was not a manifest abuse of such discretion.

4. It was not error to say, in charging the jury, that they had had an opportunity to observe the physical and mental condition of the plaintiff as far as possible from his appearance and testimony on the stand.

5. Evidence of threats and abusive language uttered by defendant in reference to plaintiff, fourteen hours after the assault was committed, was admissible to show express malice in the assault.

6. The damages, assessed at $3,250, are *held* not excessive.

APPEAL from the Circuit Court for *Dodge* County.

This is an action for an assault and battery committed on the plaintiff by the defendant September 30, 1892. The answer is a general denial. At the close of the trial the jury returned a verdict in favor of the plaintiff, and assessed his damages at the sum of $3,250. From the judgment entered thereon the defendant appeals.

*James E. Malone*, attorney, and *James J. Dick*, of counsel, for the appellant, to the point that it was error to restrict the cross-examination of the plaintiff, cited *Kirschner v. State*, 9 Wis. 143; *Knapp v. Schneider*, 24 id. 70; *Dist. of Columbia v. Armes*, 107 U. S. 521; 1 Greenl. Ev. § 446; *People v. Russell*, 46 Cal. 121; *Yanke v. State*, 51 Wis. 464, 467; *Ranger v. Goodrich*, 17 id. 78, 82; *Kellogg v. Nelson*, 5 id. 131.

*Harlow Pease*, for the respondent.

CASSODAY, J. It appears that September 12, 1891, the defendant let his farm of 200 acres to the plaintiff to work on shares for the term of five years; that thereupon the plaintiff moved into one of the dwelling houses on the farm, and took full control and possession of the whole farm under the lease, except that the defendant continued to live in another house upon the farm, which, together with the right to take water from the wells and feed and stable one horse, was reserved by the defendant in the lease; that in 1892 the plaintiff raised upon the farm, and placed in the granary thereon, about 1,000 bushels of barley; that soon after the defendant put a lock on the granary door, and fastened iron bars across the windows, to prevent the plaintiff from going into the granary; that the barley was damp and needed attention to prevent it from heating; that the plaintiff repeatedly asked the defendant to open the door of the granary, or to give him the key so that he could unlock it, but the defendant at all times re-

fused; that on the evening of September 30, 1892, the
plaintiff informed the defendant that he must open the door
before sunrise of the next morning, or that he (the plaintiff)
would open it himself; that the next morning, the defend-
ant having failed to open the door as so requested, the
plaintiff took a cold chisel and a monkey wrench, and went
to the granary door to take off the lock; that while in the
act of doing so, and standing upon a box about eighteen
inches high, with his face towards the door, the defendant
picked up a piece of fence board, and struck the plaintiff
with it on the shoulder and on the back. This is frankly
admitted by the defendant, although he claims that he so
struck after the plaintiff had refused to stop so taking off
the lock and had raised the wrench to strike him. The
witnesses on the part of the plaintiff state the facts much
stronger against the defendant, and to the effect that he
struck him upon the head as well as the back.

Upon the undisputed evidence, we think the trial court
was justified in charging the jury, in effect, that the plaint-
iff was entitled to some damages, and that the only ques-
tion for them to consider was as to the amount of damages
actually resulting from the assault and battery. And in
that connection we do not think it was improper for the
court, in charging the jury, to say "that either those dam-
ages were very severe and serious, resulting perhaps in
making the plaintiff a physical and mental wreck, or they
were very slight, and the plaintiff has all through since
that time been shamming and is, in plain language, a huge
fraud. Now, it is for you to determine which of these
things are true."

It is claimed on the part of the plaintiff, and the evidence
on his behalf tends to prove, that he was very badly in-
jured by the blows inflicted; that in consequence thereof
he was confined to his bed and under the care of physicians
for several months; that during the time he was more or

less delirious, and suffered intense pain, and had meningitis,
which finally terminated in insanity, and that he was legally
declared insane and sent to the insane asylum, but was dis-
charged therefrom January 16, 1894; that he continued to
be treated by a physician, and will never recover from the
effects of the injury; and that he was insane, or partially
insane, at the time of the trial. The defendant claims that
the plaintiff's assumed mental weakness at the time of the
trial was a pretense and a sham, and he assigns error be-
cause the court did not allow him more latitude, on cross-
examination, to expose the same. After the defendant's
counsel had cross-examined the plaintiff to the extent of
three and one-half typewritten pages, he was asked numer-
ous questions as to what he had said to divers other per-
sons, whereupon the court interrupted the examination,
and the following took place: " *The Court:* I don't think
these questions are competent. If he told these people
that, you can show it by them without calling his attention
to it. That is one rule. It is a settled law; no use talking
about that. You can show the statement of the party, and
anything about it. It has been the law ever since there was
a law. If he is in the condition, as I have said two or three
times,— if it is a sham,— that is one thing; but it don't go
to the impeachment, if he don't know and don't remember
those things. He says he never told them; he don't pre-
tend to tell; he can't even tell where he has lived; he can't
tell where he came before he came to Wisconsin. Now, it
is either a sham, it is a huge fraud, and he is a fraud, and
his case is a fraud, or else a cross-examination don't amount
to anything; that is all there is to it. But you can't prove
a fraud by him, evidently. If you can establish that,— if
you should persuade this man to tell what you could prove
by a dozen witnesses,— it wouldn't have any effect on the
case, if he is in the condition he claims to be. *Witness con-
tinues:* I don't remember what day it was that *Mr. Swee-*

*ney* struck me with this board, and I don't remember what
month it was. *Q.* What year was it? *The Court:* I can't
allow it, Mr. Malone; you must stop that kind of examina-
tion. *A.* I don't remember what year. *Mr. Malone:* Do
you rule that I shall desist from cross-examining him? *The
Court:* I rule that, in the condition that the witness appears
to be and claims to be, these questions are not proper. You
are at perfect liberty in the case, by other witnesses or by
circumstances, to show it is a sham. Just as if it was a
little child there, and you were asking him questions that
had nothing at all to do with the case. *Mr. Malone:* Then
the court holds that I have no further right to cross-
examine this witness? *The Court:* Any questions of that
kind; and I can't conceive of any questions that you have a
right to ask him now."

The object of such cross-examination was not only to test
the accuracy and credibility of the plaintiff as a witness,
but to show that his mind was stronger and his memory
better than would appear from his direct examination,— in
other words, that his want of memory and apparent mental
weakness was a mere pretense. The extent to which such
cross-examination should be indulged, especially where it
relates to facts more or less collateral to the issue, is a mat-
ter resting very much in the sound discretion of the trial
court; and hence this court will not reverse such rulings
unless there has been a manifest abuse of such discretion.
*McNair v. Rewey,* 62 Wis. 170; *Norris v. Cargill,* 57 Wis.
251; *Blitz v. U. S.* 153 U. S. 312. There does not appear
to have been any such abuse of discretion in the case at bar.

We are constrained to hold that there was no error in
refusing to instruct the jury that: "If the plaintiff in this
case was attempting to strike the defendant with the
wrench, or with anything, and put him in fear, he had a
right to defend himself; and if the defendant did not use
any more force than was necessary to protect himself, then

the defendant is not guilty of assault, and the plaintiff cannot recover."

Error is assigned because the court said, in charging the jury: "In my judgment, it don't make any difference what the peculiar, particular disease was with which *Mr. Spear* was afflicted after that transaction, if he was afflicted at all. It makes no difference whether it was meningitis cerebral or spinal, or any other disease which has a Latin or Greek name. The question is, What was his condition at that time, as a result of the assault committed by *Mr. Sweeney?*" The real point was that the jury were not to be misled by technical names, but to consider the plaintiff's real condition.

We find no error in the portions of the charge wherein the jury were told, in effect, that they had had an opportunity to observe the physical and mental condition of the plaintiff as far as possible from his appearance and testimony on the stand; that if the assault was committed with malicious motives, then they were at liberty to allow punitory as well as compensatory damages; that in case they allowed punitory damages, then they were at liberty to consider the amount of the defendant's property.

It appears that the plaintiff's hired girl, who was present at the time of the assault and battery, went to Watertown the same day as a witness in the matter; and she was allowed to testify that she returned before the plaintiff; that while she was in the plaintiff's dooryard the defendant said, "You son of a bitch! come out of here," and "God damn you! come out of there;" and then, after the plaintiff returned, the defendant again said, "God damn you, *Spear!* I'll kill you before morning." In determining the admissibility of such testimony, we must assume that such statements were in fact made, notwithstanding the denial of the defendant. It does not appear that the defendant knew the plaintiff was not in his house when he made the first two statements quoted. Both statements, therefore,

may have referred to the plaintiff. The defendant would hardly speak of the girl as a "son of a bitch." If they did both refer to the plaintiff, then they were both competent as showing express malice, and the same is true in respect to the last statement. If the words were equivocal, then their meaning was for the jury. The particular objection to the evidence seems to be that the words were spoken fourteen hours after the assault. But that does not make them irrelevant for the purpose mentioned.

We cannot say that the damages are excessive. The notice of appeal is sufficient. We find no error in the record.

*By the Court.*— The judgment of the circuit court is affirmed.